UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ARELLANO, JR.,<br><br>                                        Plaintiff,<br><br>v.<br><br>OFFICER HODGE, et al.,<br><br>                                        Defendants. | Case No.:  14-cv-00590-JLS-JLB<br><br>**REPORT AND RECOMMENDATION**<br><br>**[ECF No. 164]** |

Plaintiff Raul Arellano Jr., a state prisoner proceeding *pro se* and *in forma pauperis*, filed a Fourth Amended Complaint on November 18, 2016, alleging civil rights violations pursuant to 42 U.S.C. § 1983 against Defendants J. Chau, M. Glynn, D. Hodge, F. Sedighi, K. Seeley, P. Velardi, and L. Zamora.  (ECF No. 126.)  Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 164.)  Plaintiff opposes Defendants' motion. (ECF Nos. 191, 195.)

The Court submits this Report and Recommendation to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1 of the Local Rules of Practice for the United States District Court for the Southern District of California.  After a thorough review of the parties' moving and supporting papers, the record in this case, and the applicable law, the Court hereby **RECOMMENDS** that Defendant's Motion for Summary Judgment (ECF No. 164) be **GRANTED in part and DENIED in part**.

## I.  PROCEDURAL BACKGROUND

Plaintiff initiated the present suit by filing a complaint in this Court on March 13, 2014.  (ECF No. 1.)  Plaintiff filed a Third Amended Complaint on July 16, 2015, naming J. Chau, M. Glynn, D. Hodge, F. Sedighi, K. Seeley, P. Velardi, and L. Zamora as defendants.  (ECF No. 59.)  On October 16, 2015, Defendants moved to dismiss the claims asserted in the Third Amended Complaint against Defendants Glynn and Seeley.  (ECF No. 63.)  On December 21, 2015, Defendants also moved to dismiss the claims in Plaintiff's Third Amended Complaint asserted against Defendant Zamora.  (ECF No. 69.)  On September 9, 2016, the Honorable Janis L. Sammartino adopted in full this Court's Report and Recommendation on Defendants' motions to dismiss.  (ECF No. 116.)  Judge Sammartino dismissed with prejudice Plaintiff's Eighth Amendment claims against Defendants Glynn, Seeley, and Zamora, and dismissed without prejudice and with leave to amend Plaintiff's Fourteenth Amendment claims against Defendants M. Glynn, K. Seeley, and D. Zamora.  (*Id*.)  Plaintiff filed a Fourth Amended Complaint on November 18, 2016.  (ECF No. 126.)[1]

On November 11, 2017, Defendants filed a Motion for Summary Judgment seeking judgment against Plaintiff on all claims.  (ECF No. 164.)  Plaintiff filed an Opposition to Defendants' Motion for Summary Judgment on March 20, 2018.  (ECF No. 191.)  On March 26, 2018, Defendants filed a Reply to Plaintiff's Opposition.  (ECF No. 192.)  On April 9, 2018, Plaintiff filed a Sur-Reply to Defendants' Motion for Summary Judgment and Reply.  (ECF No. 195.)

## II.  FACTUAL BACKGROUND

Plaintiff names Correctional Officer Hodge, Nurse Practitioner Velardi, Doctors Sedighi and Chau, and Executive Officers Seeley, Glynn, and Zamora as defendants.  (ECF

---

[1] Hereafter, unless otherwise specified, all references to the "complaint" refer to Plaintiff's Fourth Amended Complaint.

No. 126 at 2.)[2]  In his complaint, Plaintiff alleges the following:  On March 3, 2012, while Plaintiff was incarcerated at Richard J. Donovan Correctional Facility ("RJDCF"), Officer Hodge moved Plaintiff from a lower bunk to an upper bunk despite Plaintiff's protests that he had a lower bunk chrono and suffered from seizures and other medical issues.  (*Id*. at 6.)  Plaintiff alleges that prior to being forced to move, he showed Officer Hodge a lower bunk medical chrono and told Hodge that he had a seizure disorder.  (*Id*.)  Within days of moving to an upper bunk, Plaintiff claims to have suffered a seizure, fallen from the bunk, and injured his back.  (*Id*.)  Plaintiff alleges that Officer Hodge's conduct violated the Eighth and Fourteenth Amendments.  (*Id*. at 6-7.)

Plaintiff reports that he was abused by officials in Mexico prior to his incarceration in the United States.  (ECF No. 126 at 11-12.)  As a result of this abuse, Plaintiff alleges that he experiences seizures and suffers from nerve damage, among other health issues. (*Id*. at 12.)  Plaintiff was prescribed Gabapentin in county jail and for a period of time at Calipatria State Prison, before being transferred to RJDCF.  (*Id*. at 12-13.)  Plaintiff alleges that after he arrived at RJDCF he was prescribed medications other than Gabapentin, which did not properly treat his seizure disorder or severe pain.  (*Id*. at 13-23.)  Plaintiff asserts Eighth and Fourteenth Amendment claims against his medical providers, Doctor Sedighi, Doctor Chau, and Nurse Practitioner Velardi, for the medical care they provided.  (*Id*.)

Lastly, Plaintiff alleges that Defendants Seeley, Glynn, and Zamora failed to properly review his grievances and appeals relating to the above allegations and failed to take action to relieve his pain and suffering, amounting to violations of the Eighth and Fourteenth Amendments.  (*Id*. at 23-39.)

## III.   LEGAL STANDARDS

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to

---

[2] All page number citations in this Report and Recommendation refer to the page numbers generated by the Court's CM/ECF system.

judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id*. at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 159–60 (1970).

If the moving party has carried its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The nonmoving party may not rely on allegations in the complaint, but "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (emphasis in original) (internal citation omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "An issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.'" *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)). If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

At summary judgment, it is not the Court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 588.

Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("[R]equiring the district court to search the entire record, even though the adverse party's response does not set out the specific facts or disclose where in the record the evidence for them can be found, is unfair."). If a party supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).

Ordinary *pro se* litigants, like other litigants, must comply strictly with the summary judgment rules. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). *Pro se* inmates are, however, expressly exempted from strict compliance with the summary judgment rules. *Id*. Courts should "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." *Id*. In addition, the Court may consider as evidence all contentions "offered [by a plaintiff] in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). This approach "exempts *pro se* inmates from strict compliance with the summary judgment rules, but it does not exempt them from *all*

5

compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013) (emphasis in original)).

## IV.  EXHAUSTION

As an initial matter, Defendants argue that Plaintiff failed to exhaust his claims against Defendants Sedighi, Chau, and Velardi relating to their alleged failure to provide Plaintiff with therapeutic shoes.  (ECF No. 164-2 at 24-25.)  In his complaint, Plaintiff alleges that Defendants Sedighi, Chau, and Velardi's failure to provide Plaintiff with therapeutic shoes violated the Eighth and Fourteenth Amendments.  (ECF No. 126 at 15, 19, 21-22.)

The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e(a), requires a prisoner challenging prison conditions to exhaust available administrative remedies before filing suit.  *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002); 42 U.S.C. § 1997e(a).  This requirement "attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)).  "Requiring exhaustion provides prison officials a 'fair opportunity to correct their own errors' and creates an administrative record for grievances that eventually become the subject of federal court complaints." *Id*. (quoting *Woodford*, 548 U.S. at 93).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204 (2007).  It is the defendant's burden to prove that there was an available administrative remedy, and that the prisoner failed to exhaust that remedy.  *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).  "Once the defendant has carried that burden, the prisoner has the burden of production.  That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*.  "If undisputed evidence

viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." *Id*. at 1179.

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90. "This means that a grievant must use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. *See also Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010). However, "[t]he grievance 'need not include legal terminology or legal theories,' because 'the primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.'" *Reyes*, 810 F.3d at 659 (quoting *Griffin*, 557 F.3d at 1120).

California prisoners are required to lodge administrative complaints on a CDCR-602 form (or a CDCR-602 HC form for a healthcare matter). The level of specificity required in the appeal is described in California regulations as follows: An inmate must "list all staff members involved," and "describe their involvement in the issue under appeal," including the "dates of the staff member's involvement." Cal. Code Regs. tit. 15, § 3084.2(a)(3). Further, the inmate must "describe the specific issue under appeal and the relief requested," and "state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form." *Id*. at 3084.2(a)(4).[3]

---

[3] Before January 28, 2011, CDCR's regulations merely required a prisoner to include a description of the problem and the action requested on the CDCR Form 602. *See* § 3084.2(a) (2010); *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting Cal. Code Regs. tit. 15, § 3084.2); *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)."). The Ninth Circuit held that because the prison's pre-2011 procedures did not specify the requisite level of detail, a grievance sufficed if it alerted

California provides an administrative remedies system for California inmates, and Plaintiff admits that he used this system to complain about the medical care he received from Defendants Sedighi, Chau, and Velardi. Thus, Defendants have met their burden to establish that there was an administrative remedy available to Plaintiff. *See Albino*, 747 F.3d at 1172. On September 26, 2012, Plaintiff filed a grievance against Defendants Sedighi, Chau, and Velardi. (ECF No.164-16 at 2-7.) Plaintiff admits that this is the only grievance he filed against these Defendants. (ECF No. 164-13 at 22-23, 25.) Plaintiff states in his grievance: "Another issue: I told doctor about my diabetes, and that my legs and arms get numb real fast which I know is not normal. Also about how when I step, it feels like nails on the floor. I know [sic] is not normal, but he didnt [sic] do nothing about it. I just put another medical form, but I don't even think they will do anything." (ECF No. 164-16 at 6.) Plaintiff requested a "deeper analysis . . . as to my Spendylosis or nerve impingement" to investigate his foot pain, among other symptoms. (*Id*. at 7.) He also requested "a nerve pain medication so when I walk I won't feel nails on the bottom of my feet." (*Id*.) Plaintiff did not request therapeutic shoes or make any other reference to his feet in his grievance. (*See id*. at 4-7.) In his appeal of the first level response to his grievance, Plaintiff stated that "every time I step it feels like nails on alot [sic] of places on my foot. At times I don't even need to step when I feel automatically nail pokes." (*Id*. at 7.)

Plaintiff argues that his grievance included statements "regarding needle poking on feet, unable to walk, numbness on feet or legs, neuropathy, from this [sic] facts a jury can infered [sic] that I also asked to Defendants orthopedic shoes for my neuropathy." (ECF No. 191 at 23.) The Court disagrees. The California Code of Regulations require Plaintiff to "describe the specific issue under appeal *and the relief requested*" in his grievance. Cal. Code Regs. tit. 15, § 3084.2(a)(4) (emphasis added). Plaintiff failed to request the relief

---

the prison to the nature of the wrong for which redress was sought. *See id*.; *accord Griffin*, 557 F.3d at 1120.

he now seeks—therapeutic shoes—in his grievance. Plaintiff specifically requested several forms of relief for his foot pain, including a "deeper analysis" of his medical issues and nerve pain medication, but did not request therapeutic shoes. (*See* ECF No. 164-16 at 4-7.) These statements failed to "alert the prison to a problem and facilitate its resolution." *Griffin*, 557 F.3d at 1120 (inmate did not exhaust remedies when he submitted a grievance requesting a ladder to access his upper bunk, and later filed a lawsuit asserting that prison staff had disregarded an order assigning him to a lower bunk). *See also McCollum v. California Dep't of Corr. & Rehab.*, 647 F.3d 870, 876-77 (9th Cir. 2011) (finding Wiccan prisoner's grievance alleging religious discrimination in the form of unequal access to worship places and sacred items insufficient to put prison officials on notice of Plaintiff's challenge to the prison's failure to establish a paid Wiccan chaplaincy). Plaintiff's complaints of foot numbness and pain and requests for other relief fail to satisfy the level of specificity required by California regulations. *See Smith v. Johal*, No. 1:15-cv-01662-LJO-MJS (PC), 2018 U.S. Dist. LEXIS 4712, at *12 (E.D. Cal. Jan. 9, 2018) ("The undisputed evidence shows that California provides an administrative-remedies system for California prisoners to complain about their health care, and that Plaintiff used that California inmate-appeal system to complain about other issues in relation to the care he received for his shoulder injury, but not about the lack of physical therapy post-surgery.").

Plaintiff argues that the 602 form did not provide him with adequate space to detail the relief he requested. (ECF No. 191 at 23.) The grievance Plaintiff submitted undermines this argument—Plaintiff chose to leave blank the portion of the form allotted for the continuation of the section on requested actions. (ECF No. 164-16 at 6.)[4]

---

[4] The first page of the 602 grievance form provides two sections to "[e]xplain your issue" (Section A) and to explain the "[a]ction requested" (Section B). (ECF No. 164-16 at 4.) If these sections do not provide enough space for the inmate, the form provides additional sections for the inmate to explain both the issue (Section A) and relief requested (Section B). (*Id.* at 6.) The form further provides that an inmate may attach supporting documentation. (*Id.* at 4.) Plaintiff left the continued "[a]ction requested" section (Section B) completely blank. (*Id.* at 6.)

9

Accordingly, Defendants have met their ultimate burden to establish that an available administrative remedy existed, but Plaintiff failed to avail himself of this remedy as to his claims relating to his request for orthopedic shoes. The Court **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED** on Plaintiff's Eighth and Fourteenth Amendment claims against Defendants Sedighi, Chau, and Velardi relating to these Defendants' failure to provide Plaintiff with orthopedic shoes.

## V. EIGHTH AMENDMENT CLAIMS

Plaintiff alleges that every named Defendant acted with deliberate indifference in violation of the Eighth Amendment. (ECF No. 126.) Defendants move for entry of summary judgment against Plaintiff on all of his Eighth Amendment claims. (ECF No. 164.)

### A. Legal Standards

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with deliberate indifference to an inmate's serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official may only be held liable for deliberate indifference when two requirements are met: First, a plaintiff must allege an objectively, "sufficiently serious" deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In the medical context, "the plaintiff must show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). The existence of chronic and substantial pain is an indication that a prisoner has a serious medical need. *McGuckin*, 974 F.2d at 1060.

Second, the prison official must have a "sufficiently culpable state of mind." *Id*. "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." *Id*. (internal quotation marks omitted). Showing deliberate indifference involves a two-part inquiry. First, "the inmate must show that the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting *Farmer*, 511 U.S. at 842).

Next, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Negligence or an inadvertent failure to provide adequate medical care does not rise to the level of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). A difference of medical opinion, where a defendant bases his or her actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, is also insufficient to establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). A plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332 (internal citations and quotations omitted). *See also Thomas*, 611 F.3d at 1150-51 ("[T]he inmate must show that the prison officials had no 'reasonable' justification for the deprivation, in

spite of that risk."). The prison "officials need not have intended any harm to befall the inmate; 'it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Lemire*, 726 F.3d at 1078 (quoting *Farmer,* 511 U.S. at 837).

### B. Defendants Seeley, Glynn, and Zamora

Judge Sammartino previously dismissed *with prejudice* Plaintiff's Eighth Amendment claims against Defendants Seeley, Glynn, and Zamora. (ECF No. 116.) Thus, the Court **RECOMMENDS dismissal with prejudice** of Plaintiff's reasserted Eighth Amendment claims against Defendants Seeley, Glynn, and Zamora.[5]

### C. Defendant Hodge

Plaintiff alleges that Defendant Hodge acted with deliberate indifference when he required Plaintiff to move to an upper bunk after Plaintiff showed Hodge a paper copy of his lower bunk chrono and told Hodge that he had a seizure disorder. (ECF No. 126 at 6.) Defendants argue that summary judgment should enter against Plaintiff on this claim as there is no genuine issue of material fact as to whether Officer Hodge acted with deliberate indifference because he reasonably relied on higher level officials and the prison's computer system instead of Plaintiff's representations and lower bunk chrono copy. (ECF No. 164-2.) Plaintiff responds by arguing that Officer Hodge had an obligation, upon being presented with evidence of Plaintiff's lower bunk chrono, to check the computer system and to call central control or medical to clear up any discrepancy. (ECF No. 191 at 3.)

The following facts are not disputed in the parties' papers: On May 12, 2011, medical officials at RJDCF issued Plaintiff a permanent lower bunk medical chrono. (ECF No. 191 at 182.) On October 17, 2011, while at Calipatria State Prison, Plaintiff was issued

---

[5] Although Plaintiff indicates in his opposition that he would like permission to amend his complaint to add other defendants if Zamora's motion for summary judgment is granted (ECF No. 191 at 30), "a motion for leave to amend 'is not a vehicle to circumvent summary judgment,'" *Burdett v. Reynoso*, 399 F. App'x 276, 278 (9th Cir. 2010) (quoting *Schlacter–Jones v. Gen. Tel.*, 936 F.2d 435, 443 (9th Cir. 1991) *abrogated on other grounds by Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683 (9th Cir. 2001) (en banc)), and the Court declines to construe this passing reference as a motion for leave to amend.

a second permanent medical chrono indicating that Plaintiff had ground floor and lower bunk housing restrictions. (*Id*. at 180.) Plaintiff was transferred back to RJDCF on November 15, 2011. (*Id*. at 170.) On March 3, 2012, Officer Hodge informed Plaintiff that he would be moving to an upper bunk in a different housing unit because an inmate in a wheelchair needed Plaintiff's lower bunk. (ECF No. 164-13 at 4-6, 9.) Plaintiff objected to the move by showing Officer Hodge a paper copy of the lower bunk medical chrono issued at Calipatria State Prison and by stating that he suffered from a condition that caused seizures. (*Id*. at 6.) Officer Hodge said that he would not go by the paper chrono and that Plaintiff would have to move. (*Id*.) Plaintiff requested Officer Hodge verify his lower bunk chrono with a sergeant before moving him. (*Id*. at 7.) But Officer Hodge refused to contact a sergeant, medical, or anyone else and stated that if Plaintiff did not move he would be placed in administrative segregation. (*Id*. at 9.) Plaintiff agreed to the move to avoid being placed in administrative segregation. (*Id*. at 7.) Before moving, Plaintiff gave Officer Hodge a Form 22 contesting the transfer, which stated that Plaintiff had showed Officer Hodge his lower bunk chrono but Hodge still required Plaintiff to move to an upper bunk. (*Id*. at 7-8; ECF No. 164-14 at 2.) Officer Hodge responded to the complaint immediately, writing that the prison's computer program, known as SOMS, showed "no housing restrictions or physical limitations" for Plaintiff and that the move had been approved by central control. (ECF No. 164-14 at 2.) Plaintiff does not recall whether he ever submitted this form to any prison official, but states that on March 4, 2012, he showed the form and his paper lower bunk chrono to several correctional officers in his new housing unit and requested a transfer to a lower bunk. (*Id*. at 11-14.) Plaintiff was not transferred back to a lower bunk until after he reported that he experienced a seizure and fell from the upper bunk, injuring his back. (*Id*. at 14, 16, 19; ECF No. 164-15 at 8.)

Defendants do not dispute that housing Plaintiff on an upper bunk presented a substantial risk of serious harm. (*See* ECF Nos. 164, 192.) Plaintiff's well-documented seizure condition, and the requirement that he be placed on a lower bunk to avoid injury, represent a serious medical need. *See McGuckin*, 974 F.2d at 1060; *Akhtar v. Mesa*, 698

F.3d 1202, 1213 (9th Cir. 2012) (lower bunk chrono and disability verification form sufficient to show serious medical need).

Thus, the survival of this claim turns on whether Officer Hodge knew that transferring Plaintiff to an upper bunk presented a substantial risk of serious harm to Plaintiff, but nonetheless deliberately disregarded that risk. *See Farmer*, 511 U.S. at 837-39. Plaintiff presents circumstantial evidence that when taken in the light most favorable to Plaintiff supports and raises a genuine issue of material fact as to whether Officer Hodge acted with deliberate indifference.

First, Plaintiff presents evidence to support the inference that Officer Hodge knew that housing Plaintiff on an upper bunk presented a substantial risk of harm to Plaintiff. Plaintiff testified in his deposition that when Officer Hodge ordered him to move, Plaintiff communicated to Officer Hodge that he could not be housed on an upper bunk because he suffered from a condition that caused seizures, and as a result, had a medical chrono that restricted his housing to a ground floor, lower bunk unit. (ECF No. 164-13 at 4-7.) Plaintiff testified that he showed Officer Hodge a paper copy of his permanent ground floor, lower bunk chrono. (*Id*. at 6.) In addition, prior to moving, Plaintiff handed Officer Hodge a Form 22 objecting to the move on the ground that Plaintiff had a permanent lower bunk medical chrono. (ECF No. 164-14 at 2.) Defendants do not dispute that Plaintiff communicated his health condition to Officer Hodge, showed Hodge a paper copy of his permanent lower bunk chrono, and provided Hodge with a written complaint objecting to the move. (*See* ECF Nos. 164, 192.)

Instead, Defendants argue that Officer Hodge reasonably relied on SOMS and higher level officials in central control, rather than Plaintiff's statements and the paper copy of his lower bunk chrono, as the most accurate reflection of Plaintiff's housing restrictions. (ECF No. 164-2 at 20-21.) The parties dispute, however, whether SOMS reflected Plaintiff's housing restrictions on the date of the move, and thus, whether Hodge reasonably relied on SOMS and higher level officials. Neither party submits evidence conclusively establishing whether or not SOMS reflected Plaintiff's housing restrictions on the date Officer Hodge

ordered Plaintiff to move to an upper bunk. Officer Hodge does not declare that on the date he moved Plaintiff, SOMS indicated that Plaintiff did not have any housing restrictions; nor does he even declare that he checked SOMS before ordering Plaintiff to move. (*See* ECF No. 164-7.)[6] In his deposition, Plaintiff testified that "[a]s soon as I gave [the Form 22] to [Hodge], he read it, wrote what he wrote, he gave me a copy. And that's when he got more furious." (ECF No. 164-13 at 8.) Plaintiff submits evidence indicating that he had two permanent lower bunk chronos (including one issued by RJDCF medical personnel on May 11, 2011), and that at the time of his transfer to RJDCF, on November 15, 2011, these chronos were reviewed and documented by RJDCF personnel. (ECF No. 191 at 170, 180-82.)[7] Plaintiff further asserts that since his transfer to RJDCF, he had only been placed in a ground floor, lower bunk. (*Id*. at 2.) As such, Plaintiff provides inferential evidence to support his claim that his housing restrictions were in SOMS at the time of his bunk reassignment. (ECF No. 191 at 2-4.) Defendants argue that Plaintiff fails to support his claim because he cites to medical records, not SOMS records. (ECF No. 192 at 2.) Defendants fail to acknowledge that Plaintiff's evidence is circumstantial and he is relying on an inference to support his claim. Viewed in the light most favorable to Plaintiff, and in the absence of admissible evidence to the contrary, this evidence supports the reasonable

---

[6] Rather than asserting in his declaration that he checked SOMS, Officer Hodge instead refers to his response to Plaintiff's Form 22 complaint and asserts merely that in that response he had previously "stated that the prison's computer system, called SOMS, showed no housing restrictions or physical limitations for Plaintiff and that Plaintiff's bed move was approved by central control—which I believed was true"; and that on the day of the move he "believed that Plaintiff did not have legitimate lower-bunk housing restrictions." (ECF No. 164-7 at 2.) Defendants do not endeavor to establish that the hearsay within the document is admissible for the truth of the matter asserted. *See* Fed. R. P. 56; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 (9th Cir. 2002) (exhibits containing inadmissible hearsay not considered at summary judgment).

[7] On October 17, 2011, while at Calipatria Prison, Plaintiff was issued a permanent medical chrono indicating that Plaintiff had ground floor and lower bunk housing restrictions. (ECF No. 191 at 180.) Plaintiff was also issued a ground floor, lower bunk medical chrono on May 12, 2011, while at RJDCF. (*Id*. at 182.) Plaintiff's healthcare transfer paperwork indicates that his medical chronos were reviewed by a nurse on November 15, 2011, at the time he was transferred back to RJDCF. (*Id*. at 170.)

inference that Plaintiff's housing restrictions may have been reflected in SOMS on the day he was moved.

Plaintiff also argues that, in light of the paper chrono he presented to Hodge, Hodge had an obligation not only to check SOMS, but to resolve any discrepancy by calling "the sergeant, medical supervisor, [or] central control to request a review of [the] medical file to determine if [Plaintiff] did have a seizure disorder [and] a [lower bunk] chrono." (*Id*. at 4.) Defendants respond that "Defendants' evidence showed that Officer Hodge verified the lack of a housing restriction both in SOMS and central control." (ECF No. 192 at 3.) As addressed above, Defendants do not even endeavor to establish the admissibility of their evidence on this point. Further, the evidence cited by Defendants does *not* establish that Officer Hodge verified the lack of housing restriction with central control after being presented with the paper chrono. Instead, it evidences that Officer Hodge relied on the fact central control would have reviewed the record for housing restrictions *before approving* the move. (ECF No. 164-7 at 2; ECF No. 164-14 at 2.) This does not address Plaintiff's argument that calling central control after Plaintiff presented the paper chrono would have led central control to find and confirm the chrono, thus preventing the bed reassignment and ultimately the fall.

Second, Plaintiff presents evidence that Officer Hodge ordered Plaintiff to move in conscious disregard of Plaintiff's serious medical need. In his deposition, Plaintiff testified that after he told Officer Hodge about his seizure disorder and health conditions, Hodge "said he didn't care." (ECF No. 164-13 at 6.) In a sworn statement made in his opposition, Plaintiff states that Officer Hodge "said he didn't care if I had seizures or if my medical chrono was valid, he was moving me anyways." (ECF No. 191 at 3.)[8] In the pleadings

---

[8] Plaintiff verified under penalty of perjury the facts set forth in his opposition to Defendants' motion for summary judgment. (ECF No. 191 at 32.) Therefore, the Court considers contentions set forth in Plaintiff's opposition where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence. *Jones*, 393 F.3d at 923. The Court does not, however, consider facts set forth in Plaintiff's sur-reply as Plaintiff did not verify this pleading. (ECF No. 195.)

14-cv-00590-JLS-JLB

before the Court, Officer Hodge does not dispute that he made these statements.  (*See* ECF Nos. 164-7, 192.)   The statements attributed to Officer Hodge could be reasonably interpreted as an acknowledgement of the substantial risk presented by moving Plaintiff to an upper bunk, as communicated by Plaintiff and evidenced by his medical lower bunk chrono, and a deliberate disregard of that risk.  Defendants argue that Officer Hodge could not have acted with deliberate indifference because a higher level official made the initial decision to move Plaintiff.  (ECF No. 164-2 at 19-20.)  But a jury could reasonably find that after Hodge was made aware of Plaintiff's seizure condition and permanent lower bunk medical chrono, he chose to ignore this evidence of a serious medical need and move Plaintiff to an upper bunk without further inquiry.

A "prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon." *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999). *See also Hamilton v. Endell*, 981 F.2d 1062 (9th Cir. 1992) (summary judgment inappropriate "where prison officials and doctors deliberately ignored the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner"), *abrogated in part on other grounds by Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002).  Here, a jury could reasonably find that Officer Hodge ignored the instructions of Plaintiff's physicians, as evidenced by Plaintiff's lower bunk medical chrono, for non-medical reasons when he moved Plaintiff to an upper bunk.  *See Akhtar*, 698 F.3d at 1213-14 (allegations that plaintiff showed defendants a medical chrono that required him to be housed on a lower bunk in a ground floor cell, but they ignored the chrono when moving him to a different bunk sufficient "to show that [defendants] were deliberately indifferent"); *Brown v. Alexander*, No. CV 13-6143-BRO RNB, 2014 WL 3893393, at *6 (C.D. Cal. Aug. 8, 2014) (collecting cases in which purposeful disregard of lower bunk and/or lower tier medical chrono was sufficient to show deliberate indifference).  Viewed in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Officer Hodge acted with deliberate indifference.  Thus, the

Court **RECOMMENDS** that Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim against Officer Hodge be **DENIED**.

### D. Medical Care Provided by Defendants Sedighi, Chau, and Velardi

Plaintiff alleges that Defendants Sedighi, Chau, and Velardi were deliberately indifferent to his serious medical needs when they failed to prescribe him medication sufficient to treat his seizure disorder and severe pain. (ECF No. 126 at 11-23.) Defendants argue that summary judgment should be granted in favor of Defendants Sedighi, Chau, and Velardi because they provided reasonable medical treatment and the specific medication Plaintiff requested, Gabapentin, had a potential for abuse and was a non-formulary medication, requiring doctors to first eliminate formulary medications. (ECF No. 164-2 at 22.) Plaintiff argues that he was not only seeking Gabapentin, but instead sought *any* medication that would properly treat his seizure disorder and severe pain as Defendants knew that the current course of treatment was not working. (ECF No. 191 at 5-8.)

#### i. Undisputed Facts

Plaintiff reported to medical providers that in September and November 2010, prior to being incarcerated, he was violently assaulted in Mexico and was beaten with a bat, kicked in the ribs repeatedly, prevented from breathing when a bag was placed over his head, and fell into a coma for several days. (ECF No. 164-15 at 2.) As a result of the 2010 assaults, Plaintiff reported experiencing severe nerve pain and seizures. (*See id.*)

In 2011, Plaintiff was housed at Calipatria State Prison. (ECF No. 164-13 at 3; ECF No. 164-15 at 2.) On August 23, 2011, neurologist Dr. Straga evaluated Plaintiff. (ECF No. 164-15 at 2.) At this appointment, Plaintiff reported that he began to experience seizures in January 2011, and experienced six seizures between the period of January and May 2011. (*Id.*) Plaintiff also reported that in April 2011, he had experienced a seizure and fell out of his upper bunk, injuring his lower back. (*Id.*) Dr. Straga noted that Plaintiff was transferred to Calipatria with four seizure medications (Gabapentin, Keppra, Tegretol, and Dilantin) and one pain medication (Elavil), but Plaintiff's prescriptions for Tegretol and Elavil were discontinued after his transfer. (*Id.*) Plaintiff reported that this made his

"mind a little clearer." (*Id.*) Dr. Straga recommended continuation of Plaintiff's prescriptions for seizure medications Gabapentin (also known as Neurontin), Keppra (also known as Levetiracetam), and Dilantin (also known as Phenytoin). (*Id.*)

On October 5, 2011, Dr. Straga saw Plaintiff again. (ECF No. 164-15 at 3.) At this appointment, Plaintiff reported that he had experienced a seizure on September 28, 2011. (*Id.*) Dr. Straga found that Plaintiff's seizure disorder was likely related to the head trauma he suffered in 2010 and placed Plaintiff on "strict sz [seizure] precautions." (*Id.* at 4.) Dr. Straga recommended slowly tapering off Dilantin until it was completely discontinued, and continuing Gabapentin and Keppra (with the possibility of reducing Plaintiff's Keppra dosage in the future). (*Id.*) After the Dilantin was discontinued, Dr. Straga recommended conducting a brain MRI. (*Id.*) On or around October 14, 2011, Dr. Straga recommended discontinuing Gabapentin, reducing the Keppra dosage, and starting Plaintiff on Lamictal (also known as Lamotrigine). (*Id.* at 5-6.) Dr. Straga noted that Plaintiff remained on "strict sz [seizure] precautions," requiring a lower bunk in a lower tier. (*Id.* at 5.) On October 17, 2011, Dr. Noonan submitted a non-formulary drug request for Lamictal, noting that Plaintiff had failed the Gabapentin/Keppra combination trial and the neurologist (Dr. Saga) now recommended a Lamictal trial for Plaintiff's seizure disorder. (ECF No. 191 at 165.)

On November 15, 2011, Plaintiff was transferred to RJDCF. (ECF No. 191 at 170.) Upon transfer, Plaintiff's medical records and chronos were reviewed and it was noted that a follow up with a neurologist was pending and that Plaintiff was currently taking Keppra and Lamictal for his seizure disorder. (*Id.* at 170-71.) On December 15, 2011, Plaintiff was seen by Nurse Practitioner Burgett (not a defendant in this case). (ECF No. 164-15 at 7.) Burgett discontinued Plaintiff's Keppra prescription and started Plaintiff on Depakote, another seizure medication. (*Id.*)

On March 3, 2012, as discussed above, Officer Hodge moved Plaintiff to an upper bunk. Plaintiff reported that he suffered a seizure and fell from his upper bunk on March 10, 2012. (ECF No. 164-15 at 8.) Soon after the reported seizure, Plaintiff was moved

back to a lower bunk. (*Id*. at 16.) Plaintiff did not request to see a medical provider for nine weeks. (ECF No. 164-13 at 16-17.) On May 14, 2012, Plaintiff filed a healthcare services request form stating that he had had a seizure on March 10, 2012 and had fallen from his upper bunk. (ECF No. 164-15 at 8.) In this request, Plaintiff stated that he had been in pain since his March 10, 2012 seizure and had also suffered a second seizure on May 8, 2012, worsening his pain. (*Id*.) Plaintiff requested a medical appointment and change in his medication. (*Id*.) Plaintiff was seen by a nurse on May 17, 2012, to whom he reported concerns about his medication change in January 2012. (*Id*.) The nurse noted that Defendant Sedighi was consulted about Plaintiff's concerns and stated that he would see Plaintiff at a regularly scheduled follow up, without any new orders in the interim. (*Id*.) On June 18, 2012, Plaintiff saw Dr. Sedighi. (*Id*. at 9.) At this appointment, Plaintiff reported back pain and stated that his last seizure was on May 8, 2012. (*Id*.) Dr. Sedighi increased Plaintiff's pain medication and recommended stretching exercises. (*Id*.) Dr. Sedighi did not adjust Plaintiff's seizure medication. (*See id*.)

On August 14, 2012, Plaintiff was seen by Defendant Chau. (*Id*. at 10.) At this appointment, Plaintiff complained that his current pain medication was ineffective. (*Id*.) Dr. Chau changed Plaintiff's pain medication and ordered an x-ray of Plaintiff's spine. (*Id*. at 10-11.) Dr. Chau did not adjust Plaintiff's seizure medication. (*See id*.)

On October 19 and 20, 2012, Plaintiff was seen by Defendant Velardi. (*Id*. at 12-13.) Nurse Practitioner Velardi noted that Plaintiff used to be on Keppra for his seizure disorder and restarted this prescription. (*Id*.) Velardi also added another pain medication, ordered a test of Plaintiff's valproic acid levels, and re-ordered the spine x-ray for Plaintiff's back pain. (*Id*.; ECF No. 164-9 at 5.) On December 10, 2012, Velardi saw Plaintiff again. (ECF No. 164-15 at 15.) Velardi re-ordered the spine x-ray Dr. Chau had initially ordered on August 14, 2012, continued Plaintiff's Keppra prescription, and counseled Plaintiff to consistently take medications as his seizure medication levels were low. (*Id*.) On February 12, 2013, Plaintiff again saw Velardi and communicated that he felt drowsy and that his last seizure was approximately one month ago. (*Id*. at 16.) Velardi

adjusted Plaintiff's seizure medications by discontinuing Depakote and continuing Plaintiff's prescription for Keppra.  (*Id*.)

Plaintiff was seen by another neurologist on November 4, 2014.  (*Id*. at 30.)  The neurologist found that there was no objective evidence indicating Plaintiff had a seizure disorder and noted there were no eyewitnesses to any of Plaintiff's seizures since he was in CDCR custody (since 2011).  (*Id*. at 30-31.)  The neurologist declined Plaintiff's request for Gabapentin and recommended Plaintiff continue his current dosage of Keppra.  (*Id*. at 31.)

### ii.  Defendant Sedighi

Defendants argue that Dr. Sedighi only saw Plaintiff once, on June 18, 2012, and that he provided appropriate treatment at this appointment.  (ECF No. 164-2 at 22.) Defendant Sedighi declares that at the time of this appointment, he believed that the pain and seizure medications Plaintiff was prescribed were the most appropriate for his medical conditions and that Gabapentin was not indicated for Plaintiff.  (ECF No. 164-8 at 2.)  Dr. Sedighi further declares that at the time at issue in this action, Gabapentin was not FDA-approved to treat Plaintiff's condition, was non-formulary at RJDCF, and ran a risk of leading to dependence.  (*Id*.)  Dr. Feinberg, Defendants' expert, supports Defendant Sedighi's representation that Gabapentin was not FDA-approved to treat Plaintiff's condition, was non-formulary at RJDCF, and ran a risk of leading to dependence.  (ECF No. 164-6 at 2, 5.)[9]  Defendants argue, *inter alia*, that Dr. Sedighi's decision not to prescribe Plaintiff Gabapentin was reasonable because the neurologist who had seen

---

[9] Dr. Feinberg also represents that upon review of Plaintiff's medical records, he concludes that Defendants Sedighi, Chau, and Velardi did not choose their respective courses of treatment in conscious disregard of an excessive risk to Plaintiff's health.  (ECF No. 164-6 at 6.)  Plaintiff objects to Dr. Feinberg's declaration to the extent that his opinion is based on facts of which he has no personal knowledge—specifically, Defendants' subjective state of mind.  (ECF No. 191 at 22, 24.)  Plaintiff's objection is sustained in part; the Court does not consider Dr. Feinberg's opinion in its analysis of whether Defendants Sedighi, Chau, and Velardi consciously disregarded Plaintiff's serious medical need.  *See Toguchi*, 391 F.3d at 1060.  As addressed below, the Court only considers Dr. Feinberg's expert testimony on the issue of the reasonableness of the care provided.

Plaintiff most recently, Dr. Saga, had recommended discontinuing Plaintiff's prescription for Gabapentin.

Plaintiff argues that during his appointment with Dr. Sedighi, he communicated that his pain was so severe that he was unable to sleep, stretch, walk, or "bend to do bathroom needs," and that at times the pain was so bad it caused Plaintiff to vomit. (ECF No. 191 at 10.) Plaintiff states that he told Dr. Sedighi that he was previously prescribed Gabapentin, which alleviated his pain without side effects. (*Id*.) Plaintiff argues that he told Dr. Sedighi that he had severe nerve pain and uncontrolled seizures. (*Id*. at 31.) Plaintiff argues that Dr. Sedighi's decision to only increase Plaintiff's Ibuprofen dosage from 400 to 600 mg amounted to deliberate indifference of Plaintiff's serious medical need. (*Id*. at 10, 31.) Plaintiff does not present any evidence to suggest that he ever saw Dr. Sedighi after his June 18, 2012 appointment.

Defendants do not dispute, and Plaintiff presents sufficient evidence for a jury to reasonably infer, that Plaintiff had a serious medical need as he declares that his pain was so severe that he was unable to fulfill his basic needs of eating, sleeping, and going to the bathroom. *See McGuckin*, 974 F.2d at 1060. Plaintiff also presents sufficient evidence from which a jury could reasonably infer that Dr. Sedighi had knowledge of that serious medical need as Plaintiff declares that he communicated to Dr. Sedighi the severity of his pain and the effect it had on his daily activities. *See Farmer*, 511 U.S. at 836-39.

Plaintiff fails to present evidence, however, from which a jury could reasonably infer that Dr. Sedighi purposefully disregarded that serious medical need. *See id*. Plaintiff argues that Defendant Sedighi should have prescribed him Gabapentin because Plaintiff told Dr. Sedighi that this medication previously alleviated his symptoms without side effects. (ECF No. 191 at 10.) Plaintiff argues that Dr. Sedighi's increase in Plaintiff's Ibuprofen dosage alone was insufficient to treat his symptoms. (*See id*.) This evidence is insufficient for a jury to reasonably find that Dr. Sedighi purposefully disregarded Plaintiff's serious medical need. First, at the time Dr. Sedighi (and Dr. Chau and Nurse Practitioner Velardi) saw Plaintiff, the last neurologist to see Plaintiff had discontinued his

prescription for Gabapentin after Plaintiff experienced a seizure while taking this medication. (ECF No. 164-15 at 5-6.)[10]  And, in the record before the Court, no other medical provider ever recommended treating Plaintiff with Gabapentin in the relevant time period.  Second, when viewed in the light most favorable to Plaintiff, the evidence suggests, at most, only a difference in medical opinion between Dr. Sedighi and Plaintiff's prior physician (and Plaintiff) or possibly negligence.  Dr. Sedighi was not required to agree with Plaintiff's prior medical providers or provide Plaintiff with the specific course of treatment he requested.  A mere difference in medical opinion is insufficient to meet the high bar to establish deliberate indifference.  *Toguchi*, 391 F.3d at 1058.  And Plaintiff is not entitled to request prescription of a specific medication.  *See id.*  Further, even if Dr. Sedighi was negligent, medical malpractice or negligence also falls short of meeting the high bar for establishing deliberate indifference.  *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016); *Estelle*, 429 U.S. at 104.  As a result, Plaintiff fails to present sufficient evidence for a jury to reasonably infer that Dr. Sedighi's course of treatment was medically unreasonable under the circumstances, and that Dr. Sedighi chose this course in conscious disregard of an excessive risk to Plaintiff's health.  *See Jackson*, 90 F.3d at 332. The Court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's Eighth Amendment claims against Defendant Sedighi.

### iii.  Defendant Chau

Defendants argue that Defendant Chau is entitled to entry of summary judgment on Plaintiff's Eighth Amendment claims against him because Dr. Chau provided Plaintiff with appropriate treatment. (ECF No. 164-2 at 22.)  Defendants present evidence that Dr. Chau saw Plaintiff on August 14, 2012. (ECF No. 164-15 at 10.)[11]  At this appointment, Plaintiff

---

[10] Plaintiff argues that Dr. Saga only discontinued his prescription for Gabapentin "because she was trying out a different medication to see if this new med will be more effective then [sic] [Gabapentin] was." (ECF No. 191 at 15.)  Even if true, this would not change the fact that Dr. Saga recommended discontinuing Gabapentin, finding it medically unnecessary at the time.

[11] The record contains evidence that Dr. Chau treated Plaintiff after 2012; however, the Court only considers evidence relating to Dr. Chau's treatment in 2012 because Plaintiff represents in his opposition

complained that his current pain medication was ineffective. (*Id*.) Defendants argue that Dr. Chau appropriately addressed Plaintiff's complaints by changing his pain medication and ordering an x-ray of Plaintiff's spine. (*Id*. at 10-11.) Dr. Chau declares that he believed that the pain and seizure medications Plaintiff was prescribed were the most appropriate for his medical conditions, and that, consistent with the neurologist's recommendation, Gabapentin was not indicated for Plaintiff. (ECF No. 164-10 at 2-3.)

Plaintiff argues that Defendant Chau knew that Plaintiff was previously prescribed Gabapentin to treat his nerve pain because he reviewed Plaintiff's medical records. (ECF No. 191 at 15.) Plaintiff argues that Dr. Chau knew that Plaintiff was requesting reinstatement of his Gabapentin prescription because he communicated this request to Chau and Plaintiff had submitted a healthcare medical request seeking reinstatement of the prescription. (*Id*. at 15-16.) Plaintiff argues that when he was on Gabapentin, his seizures were better controlled and he did not experience the side effects he experienced with other types of seizure medication. (*Id*. at 16.) Plaintiff represents that he communicated to Dr. Chau that his current medication made him nauseous and drowsy, and caused memory loss, and that his pain was so severe he was unable to eat and it sometimes caused him to vomit. (*Id*. at 11.) Plaintiff states that he told Dr. Chau that the pain medication he was currently prescribed, Ibuprofen, and the pain medication Dr. Chau chose to prescribe him at this appointment, Sulindac, would not treat his nerve pain because another doctor had previously told Plaintiff this was the case. (*Id*. at 16.) Plaintiff represents that he told Dr. Chau that Gabapentin was the only medication that effectively treated his pain. (*Id*. at 11.)

Viewed in the light most favorable to Plaintiff, a jury could reasonably find that Plaintiff had serious medical need as he represents that his pain affected his daily life activities. *See McGuckin*, 974 F.2d at 1060. A jury could also reasonably infer that Dr.

---

that he is only pursuing his claims against Defendant Chau for his treatment in 2012 as his claims against Defendant Chau for his medical treatment after this time are addressed in other lawsuits. (ECF No. 191 at 5.)

Chau had knowledge of that need as Plaintiff represents he communicated his symptoms to Dr. Chau. *See Farmer*, 511 U.S. at 836-39.

Plaintiff fails to present sufficient evidence, however, from which a jury could reasonably infer that Dr. Chau purposefully disregarded that serious medical need. *See id.* Plaintiff complained of pain and Dr. Chau addressed this complaint by prescribing Plaintiff a different pain medication and ordering an x-ray for further evaluation. Plaintiff presents no evidence to support his own medical opinion (and the hearsay opinion of an unidentified doctor) that Ibuprofen and Sulindac are inappropriate to treat nerve pain. Moreover, as discussed above, in the record before the Court, the only medical provider to ever prescribe Plaintiff Gabapentin in the relevant time period discontinued this prescription after Plaintiff had a seizure while taking this medication. The failure to provide Plaintiff with the specific medication he requested does not amount to deliberate indifference. *See Toguchi*, 391 F.3d at 1058. Plaintiff fails to present sufficient evidence from which a jury could reasonably infer that Dr. Chau's chosen course of treatment at Plaintiff's August 14, 2012 appointment—prescribing Sulindac and ordering an x-ray for further evaluation—was medically unacceptable under the circumstances, and presents no evidence that Dr. Chau chose this course of treatment in conscious disregard of an excessive risk to Plaintiff's health. *See Jackson*, 90 F.3d at 332. Thus, the Court **RECOMMENDS** Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's Eighth Amendment claims against Defendant Chau.[12]

### iv. Defendant Velardi

As with Drs. Sedighi and Chau, Defendants argue that Nurse Practitioner Velardi's chosen course of treatment was reasonable under the circumstances. (ECF No. 164-2 at 22-23.) Defendants present evidence that Defendant Velardi saw Plaintiff four times over

---

[12] As with Dr. Sedighi, the Court considers only the evidence relating to Dr. Chau's treatment of Plaintiff in 2012. This recommendation is not based on any evidence of Dr. Chau's treatment after 2012 as Plaintiff represents that his claims against Dr. Chau after 2012 are addressed in a separate lawsuit. (ECF No. 191 at 5.)

the course of four months—between October 19, 2012 and February 12, 2013. (ECF No. 164-15 at 12-16.) Plaintiff's medical records indicate that during this time, Velardi re-ordered spine x-rays (with normal results), added a pain medication and a seizure medication to Plaintiff's prescriptions, later adjusted this medication, counseled Plaintiff regarding his back exercises, and noted that his low back pain was musculoskeletal. (*Id*.) Nurse Practitioner Velardi declares that at her December 10, 2012 and February 12, 2013 appointments with Plaintiff, she noted that Plaintiff had a steady gait and walked unassisted. (ECF No. 164-9 at 2.) Velardi declares that each time she saw Plaintiff, she believed that the pain and seizure medications Plaintiff was prescribed were the most appropriate for his medical conditions, and that Gabapentin was not indicated for him. (*Id*. at 2-3.)

Plaintiff argues that Defendant Velardi was deliberately indifferent because she failed to prescribe him the only medication Plaintiff told her would treat his seizure disorder and nerve pain, Gabapentin, and instead prescribed him seizure and pain medications that he had previously been prescribed and caused severe side effects and did not treat his pain. (ECF No. 191 at 11-12.) Plaintiff represents that on November 14, 2012, Velardi interviewed him in regards to his September 26, 2012 grievance, which stated that Plaintiff's seizures and neck and back pain were uncontrolled on his current medication, and reviewed his medical records, which indicated that medical providers had previously discontinued Keppra and Elavil. (ECF No. 191 at 11, 16; ECF No. 164-16 at 6.) Plaintiff further represents that he told Velardi that Keppra, the seizure medication she prescribed, and Elavil, the pain medication she prescribed, caused him to have suicidal thoughts and made him dizzy. (*Id*. at 17-18.)[13] He represents that he also told Velardi that Elavil did "nothing towards my 2 parts of nerve damage pain, (neuropathy & upper back & head)," and was discontinued twice by prior medical providers because of the side effects he

---

[13] Plaintiff also declares that in 2016, Keppra was discontinued by a psychiatrist who determined that this medication was causing Plaintiff to experience suicidal thoughts. (*Id*. at 18.)

experienced—dizziness, falls, and panic attacks. (*Id*. at 17.) When Plaintiff told Velardi that the medication she prescribed was ineffective and caused severe side effects, Plaintiff represents that Velardi "didn't care." (*Id*.) Plaintiff represents that when Plaintiff requested a change in medication, Velardi initially refused because she "said she wasn't changing nothing because Dr. Chau and Sedighi didn't do it." (ECF No. 191 at 12; ECF No. 126 at 22.)[14] When Plaintiff again requested a change in medication, Plaintiff represents that Nurse Velardi "got mad by saying that she wasn't giving me nothing because the other doctors didn't, and because is [sic] extra money taken away from tax payers like her." (*Id*.) Plaintiff further represents that Velardi "said she knew Gabapentin most likely will be effective to my nerve damage pain but she [sic] rather let [sic] me to suffer then [sic] to give me Gabapentin." (ECF No. 191 at 17.) Plaintiff argues that Velardi would "rather see me dead in pain or side effects than to grant me [Gabapentin] or something similar." (*Id*. at 12.)[15] He argues that "[i]t's also deliberate indifference when pain deprives Plaintiff of life necessity's [sic] and doctor forces patient to continue on medication (Elavil) when knowingly [sic] that such medication has severe side effects that puts health & life at risk." (*Id*. at 22.) Lastly, Plaintiff argues that Nurse Practitioner Velardi "agree[d]" that an x-ray would not show whether Plaintiff was experiencing nerve pain or had sustained nerve damage as a result of the assaults in Mexico and his March 2012 fall from the upper bunk, but nonetheless used the x-ray results to justify her refusal to prescribe Plaintiff Gabapentin (or another medication that would treat his nerve pain) and characterized Plaintiff's pain as only musculoskeletal. (*Id*. at 17.)

---

[14] As noted above, the Court considers contentions set forth in Plaintiff's verified opposition to Defendants' motion to summary judgment where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence. *See Jones*, 393 F.3d at 923. In his verified opposition, Plaintiff realleges, by reference to the otherwise unverified operative complaint, the statements he represents that Defendant Velardi made to him. (ECF No. 191 at 12.)

[15] Defendants do not dispute, or address, Plaintiff's representations regarding Defendant Velardi's statements. (*See* ECF Nos. 164, 192.)

Viewed in the light most favorable to Plaintiff, a jury could reasonably find that Plaintiff had serious medical need as he represents that he was suffering from daily pain and experienced seizures. *See McGuckin*, 974 F.2d at 1060. A jury could also reasonably infer that Nurse Practitioner Velardi had knowledge of that need as Plaintiff represents he communicated his symptoms to Velardi. *See Farmer*, 511 U.S. at 836-39.

Plaintiff presents sufficient evidence from which a jury could reasonably infer that Velardi purposefully disregarded that serious medical need. *See id*. Here, unlike his claims against Drs. Sedighi and Chau, Plaintiff presents evidence supporting the inference that Nurse Practitioner Velardi declined to change Plaintiff's seizure and pain medications for reasons unrelated to her medical assessment of Plaintiff's condition.[16] Defendant Velardi's alleged statement that she would not provide Plaintiff with medication changes, despite the serious side effects and pain Plaintiff told Velardi he was experiencing, because Drs. Sedighi and Chau had not and because it would cost tax payers like her money could be reasonably interpreted as a recognition of Plaintiff's serious medical need, and a purposeful disregard of that need for non-medical reasons. *See Jett*, 439 F.3d at 1096-98. Viewing the evidence in the light most favorable to Plaintiff, a jury could also reasonably conclude that Defendant Velardi's chosen course of treatment was medically unreasonable under the circumstances. *See Jackson*, 90 F.3d at 332.[17] Although the record indicates that Velardi

---

[16] Defendants argue that they could not prescribe Plaintiff Gabapentin because it was a non-formulary medication and formulary medications first had to be exhausted. (ECF No. 164-2 at 22.) Plaintiff presents evidence that Nurse Velardi was already prescribing him a non-formulary medication, Keppra, during 2012, (ECF No. 164-15 at 13), and that non-formulary requests for Keppra for Plaintiff were granted during this time (ECF No. 191 at 163-64). Plaintiff further presents evidence that other prison physicians submitted non-formulary requests for Gabapentin for Plaintiff in 2011 and 2016, which were approved. (ECF No. 191 at 159-61, 166.) Regardless, Plaintiff does not allege that Defendant Velardi was deliberately indifferent only because she would not prescribe him Gabapentin, but because she would not prescribe him *any* medication to treat his seizure disorder and pain other than medications he had already tried and that had caused severe side effects and did not control his pain and seizures. (ECF No. 191 at 6-8.)

[17] Defendants argue that their medical expert, Dr. Feinberg, concluded that the course of treatment Defendant Velardi chose was medically acceptable under the circumstances. (ECF No. 164-2 at 23-24; ECF No. 164-6 at 6.) Plaintiff argues that Dr. Feinberg's opinion has little weight, *inter alia*, because Dr.

did change Plaintiff's medications on several occasions, Plaintiff represents that over the course of several months he communicated the ineffectiveness of these medications (Keppra and Elavil) to Velardi and that the medications had been previously discontinued because they caused him to experience severe side effects.[18] Plaintiff also represents that he communicated to Velardi that the medications she prescribed him caused him to experience severe side effects, including suicidal thoughts, dizziness, falls, and panic attacks. Viewing the evidence in the light most favorable to Plaintiff, despite this awareness, Defendant Velardi continued to prescribe Plaintiff medications that she knew did not effectively treat Plaintiff's nerve pain, other medical providers had previously discontinued, and which caused Plaintiff to experience severe side effects, all for allegedly non-medical reasons. A jury could reasonably conclude that Defendant Velardi's chosen course of treatment was medically unacceptable in light of the circumstances and amounted to deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition.") (citation omitted); *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that

---

Feinberg reviewed Plaintiff's medical records, but did not consider the severe side effects Plaintiff communicated that he was experiencing as a result of taking Keppra and Elavil in forming his opinion. (ECF No. 191 at 24-25.) The Court agrees with Plaintiff. The medical records Dr. Feinberg reviewed do not mention the severe side effects Plaintiff represents that he communicated to Defendant Velardi. (*See* ECF No. 164-6 at 3-4; ECF No. 164-15 at 12-13, 15-16.) Thus, although Dr. Feinberg's report is some evidence that Velardi's chosen course of treatment could have been medically acceptable under the circumstances, viewing the evidence in the light most favorable to Plaintiff, Dr. Feinberg's opinion does not prevent a jury from reasonably finding otherwise.

[18] Defendant Velardi prescribed Plaintiff Keppra for his seizure disorder and Elavil for his pain, and continued his prescription for Sulindac. (ECF No. 164-15 at 13.) As discussed above, Plaintiff represents that prior to Velardi's prescriptions, he had experienced severe side effects as a result of these medications, which he communicated to Velardi. Plaintiff's medical records also indicate that his prescriptions for Keppra and Elavil were discontinued by different medical providers before Velardi prescribed these medications to Plaintiff. (ECF No. 164-15 at 2 (noting on August 23, 2011, that Plaintiff's Elavil prescription had been discontinued and that Plaintiff now "feels [his] mind is a little clearer"); ECF No. 191 at 136 (discontinuing Elavil (Amitriptyline) on January 25, 2012); *Id.* at 139 (discontinuing Keppra (Levetiracetam) on December 15, 2011); *Id.* at 133 (discontinuing Keppra (Levetiracetam) on May 1, 2012).)

[the defendant medical provider] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation."); *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (deliberate indifference may be proved by showing that the defendant ordered a certain kind of treatment "knowing that it was ineffective, either as a means of toying with him or as a way of choosing 'the easier and less efficacious treatment.'") (quoting *Estelle*, 429 U.S. at 104) (some internal quotation marks omitted); *Masden v. Risenhoover*, No. C 09-5457 SBA PR, 2013 WL 1345189, at *17 (N.D. Cal. Mar. 29, 2013) (genuine issues of material fact precluded summary judgment where there was evidence that defendant nurse "continued to follow an ineffective course of pain treatment for Plaintiff despite his repeated complaints that her actions were exacerbating his condition and causing severe side effects"). Finally, Plaintiff presents sufficient evidence for a jury to reasonably find that the failure to change his seizure and pain medications to something more effective caused harm. *See Jett*, 439 F.3d at 1098. The record contains numerous representations by Plaintiff, including grievances and healthcare request forms, indicating that Plaintiff communicated his ongoing pain, uncontrolled seizures, and side effects to prison officials. Because there is a genuine issue of material fact as to whether Defendant Velardi acted with deliberate indifference to Plaintiff's serious medical need, the Court **RECOMMENDS** Defendants' motion for summary judgment be **DENIED** as to Plaintiff's Eighth Amendment claims against Defendant Velardi.

## VI.    FOURTEENTH AMENDMENT CLAIMS

Plaintiff alleges that all Defendants' actions amounted to a violation of the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 126.) Defendants seek entry of summary judgment against Plaintiff on all of these claims. (ECF No. 164.)

### A. Legal Standards

The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated a like." *City of*

*Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff may state a claim under § 1983 for a violation of the Equal Protection Clause in two ways. First, a plaintiff may show that a defendant acted with an intent or purpose to discriminate against the plaintiff based upon his membership in a protected class, such as race. *Barren v. Harrington*, 152 F.3d 1193, 1194-95 (9th Cir. 1998). Second, if the action in question does not involve a plaintiff's membership in a suspect class, a plaintiff may establish an equal protection claim under the "class of one" theory by showing he was intentionally treated differently from other similarly situated individuals without a rational basis for the difference in treatment. *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 601 (2008); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025 (9th Cir. 2007). "A class of one plaintiff must show that the discriminatory treatment 'was intentionally directed just at him, as opposed to being an accident or a random act.'" *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)). A class of one claim is premised on the theory that "defendants . . . harbor animus against [plaintiff] in particular and therefore treated [him] arbitrarily." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

### B. Analysis

Plaintiff asserts Fourteenth Amendment claims against every named Defendant. Specifically, Plaintiff alleges that Officer Hodge's decision to move him to an upper bunk (ECF No. 126 at 7); Defendants Sedighi, Chau, and Velardi's medical treatment (*id*. at 17-19, 21); and Defendants Glynn, Seeley, and Zamora's review of Plaintiff's grievances (*id*. at 27) all amounted to violations of the Equal Protection Clause.

Defendants request entry of summary judgment against Plaintiff on his Fourteenth Amendment claims against Defendants Hodge, Sedighi, Chau, Velardi, Seeley, and Glynn because they treated Plaintiff the same as any other inmate. (ECF No. 164-2 at 25.)

Defendants Hodge, Sedighi, Chau, Velardi, Seeley, and Glynn all declare that they treated Plaintiff the same as they treated any other similarly situated inmate. (ECF Nos. 164-5, 164-7, 164-8, 164-9, 164-10, 164-11.). Defendants request entry of summary judgment against Plaintiff on his Fourteenth Amendment claim against Defendant Zamora because she was not involved in the review of his grievance and believes Plaintiff was treated the same as any other similarly situated inmate. (ECF No. 164-2 at 26.) Defendant Zamora declares that she did not review or sign Plaintiff's third level grievance. (ECF No. 164-12 at 2.) Instead, Zamora declares, Plaintiff's grievance was reviewed and signed by someone else in her office. (*Id.*) Defendant Zamora declares that it is her belief that Plaintiff was treated the same as any other similarly situated inmate. (ECF No. 164-12 at 2.)

Plaintiff presents no evidence to support the inference, and does not argue in his opposition, that any Defendant violated the Equal Protection Clause. (*See* ECF No. 191.) Instead, Plaintiff argues that all Defendants were deliberately indifferent. (*See id.*)[19]

Defendants have met their burden to show that there is no genuine issue of material fact as to whether all defendants treated Plaintiff the same as any other similarly situated inmate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Plaintiff fails to present any evidence, and there is none in the record before the Court, indicating that any Defendant treated Plaintiff differently than other similarly situated inmates. (*See generally* ECF Nos. 164, 191, 192.) First, there is no evidence suggesting that Defendants intentionally discriminated against Plaintiff based on his membership in a protected class, such as a certain race, national origin, or religion. *See Barren*, 152 F.3d at 1194-95. Second, there is no evidence indicating that any

---

[19] Plaintiff's deliberate indifference claims were addressed above.

14-cv-00590-JLS-JLB

Defendant "harbored animus" against him individually and intentionally treated Plaintiff differently from other similarly situated individuals without any rational basis for the different treatment. *See Lazy Y Ranch Ltd.*, 546 F.3d at 592. Thus, the Court **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's Fourteenth Amendment claims against all Defendants.

## VII. QUALIFIED IMMUNITY

Qualified immunity entitles government officials to "*an immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The driving force behind creation of the qualified immunity doctrine was a resolution to resolve unwarranted claims against government officials at the earliest possible stage of litigation. *Id.*

The courts conduct a two-prong analysis to determine whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). First,[20] examining the alleged facts in favor of the plaintiff, the court must consider whether the alleged facts show the government official's actions violated the plaintiff's constitutional rights. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*;

_____

[20] Courts are not required to conduct the *Saucier* two-prong analysis in a particular sequence. *Pearson*, 555 U.S. at 236.

accord *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 711 (9th Cir. 2010). On the other hand, if a violation could be made out on a favorable view of the plaintiff's facts, then the court must next determine whether the constitutional right purportedly violated was clearly established in the specific context of the case at hand. *Saucier*, 533 U.S. at 201.

"A right is 'clearly established' when its contours are sufficiently defined, such that 'a reasonable official would understand that what he is doing violates that right.'" *Foster v. Runnels*, 554 F.3d 807, 815 (9th Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). If the law does not "put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. If, however, a reasonable official would have known that the alleged conduct was in violation of a clearly established constitutional right, then immunity is forfeited. *Id.* "[T]he law may be clearly established even if there is no case directly on point. . . . It is enough if 'in the light of pre-existing law the unlawfulness is apparent.'" *Inouye v. Kemna*, 504 F.3d 705, 715 (9th Cir. 2007) (quoting *Wilson*, 526 U.S. at 615).

As discussed above, the Court concludes that Defendants Sedighi, Chau, Glynn, Seeley, and Zamora did not violate Plaintiff's constitutional rights. Thus, without further inquiry, these Defendants are entitled to qualified immunity. *See Saucier*, 533 U.S. at 201.

There is a genuine issue of material fact as to whether Defendants Hodge and Velardi were deliberately indifferent to Plaintiff's serious medical needs. "The general law regarding the medical treatment of prisoners was clearly established at the time of the incident[s]." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002). It is clearly established that a prisoner has a right under the Eighth Amendment to "have prison officials not be deliberately indifferent to serious medical needs." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995) (quotation omitted). *See also Clement*, 298 F.3d at 906 (finding it is clearly established that prison officials may not intentionally deny or delay access to medical care); *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992) (finding it is clearly established that a prison official may not purposefully disregard a physician's orders); *Jackson v.*

*McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (same). Taking the facts in the light most favorable to Plaintiff, Defendant Hodge should have known that ignoring Plaintiff's representations that he suffered from seizures and his lower bunk medical chrono violated Plaintiff's Eighth Amendment right. Similarly, Defendant Velardi should have known that denying Plaintiff effective medication for non-medical reasons violated Plaintiff's Eighth Amendment right to medical care. Thus, Defendants Hodge and Velardi are not entitled to qualified immunity.

**VIII. CONCLUSION**

For the reasons discussed above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) accepting this Report and Recommendation; and (2) **GRANT in part and DENY in part** Defendants' Motion for Summary Judgment (ECF No. 164).

**IT IS ORDERED** that no later than **August 13, 2018** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 24, 2018** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated: July 30, 2018

*Jill Burkhardt*

Hon. Jill L. Burkhardt
United States Magistrate Judge

14-cv-00590-JLS-JLB